The State of Ohio, Appellee, *v.* Domer, Appellant.

[Cite as State v. Domer, 1 Ohio App. 2d 155.]

(No. 3082—Decided December 8, 1964.)

*Mr. Norman J. Putnam,* prosecuting attorney, and *Mr. David D. Dowd, Jr.,* for appellee.

*Mr. Harry W. Schmuck* and *Mr. Sherlock H. Evans,* for appellant.

Skeel, C. J. This appeal comes to this court on questions of law from a decision of conviction, judgment and sentence by a three-judge court sitting in Stark County. The charges were set out in an indictment containing two counts, each charging murder in the first degree. The first count charged the defendant with the purposeful killing of one Howard Franklin Riddle with deliberate and premeditated malice. This count was based on the provisions of Section 2901.01, Revised Code. The other count, based on the provisions of Section 2901.28, Revised Code, charged the defendant with having caused the

death of Howard Franklin Riddle while forcibly, fraudulently or maliciously abducting, carrying him away or kidnapping him or while holding and controlling him or having him in possession in furtherance of such unlawful purpose. The prosecuting attorney upon proper demand, filed a bill of particulars which clearly states that death was caused by incineration.

The facts contended for by the respective parties cannot, except in one or two instances of major importance, be reconciled. The case presents two questions of fact in which the state is required to establish the truth of its contentions by evidence that satisfies the triers of the facts beyond reasonable doubt. The two major questions thus presented are, first, venue, that is whether any part of the force that caused the death of Riddle, if it is established that death was a proximate result of the alleged unlawful acts of the defendant, took place or commenced in Stark County, and, second, if venue is established by the proper degree of proof, then whether death was occasioned purposely by the alleged unlawful acts of the defendant acting with deliberate and premeditated malice to cause the death of Riddle.

The defendant at every stage of the proceeding claimed that the two counts could not be maintained and prosecuted in the same case, that is contained in the same indictment, because the unlawful killing of the deceased charged in each count of the indictment was the result of the same acts and that the state should be directed to elect which count it would pursue. These claims are not justified, and defendant's motions seeking to compel the state to elect upon which count it would proceed were properly overruled. A criminal act may violate the provisions of two or more statutes defining punishable criminal conduct. *State* v. *Ferguson,* 175 Ohio St. 390. However, from a careful study of all of the evidence, it is clear that some of the elements of the crime charged in the second count of the indictment, that is causing the death of the decedent while he was being held kidnaped or unlawfully deprived of his liberty as defined by Section 2901.28, Revised Code, are not supported by sufficient proof, and the court should have and did discharge him on that count. But the statement of the court that to hold him on both counts would constitute double jeopardy has no foundation in law and was clearly erroneous.

The defendant claims that upon his arrest he was denied his constitutional and statutory right to consult with his lawyer as provided by Section 2937.03, Revised Code (129 Ohio Laws 582, 749). Such refusal on the part of the state cannot be countenanced. This request was first asserted at his home at the time of his arrest. The defendant was arrested at his home in Canton on Sunday afternoon, April 28, 1963. There are two exhibits, erroneously received into evidence, showing the attempt of the prosecuting attorney to force the defendant to make a statement as to his conduct and whereabouts from April 1 to April 28, 1963. These inquisitions, which were transcribed and admitted in evidence, show that on several occasions the defendant again requested the right to talk to his lawyer, which requests were refused until after the defendant was wrongfully taken in an automobile to Akron in Summit County by the Sheriff and the Prosecuting Attorney of Stark County, and before an affidavit charging a crime had been filed or indictment returned and a warrant issued for his arrest. An affidavit was filed in the Municipal Court of Canton on May 3, 1963, and a warrant issued, which was never served according to a letter of the Sheriff of Stark County dated May 14, 1963, because an indictment had then been returned.

The record fails completely to show that the provisions of Sections 2935.05 (128 Ohio Laws 97, 98), 2937.02 (128 Ohio Laws 97, 103), and 2937.03 (129 Ohio Laws 582, 749), Revised Code, were complied with. A prosecutor owes the duty to see to it that due process is afforded a defendant. Under the authority of a number of recent cases of the Supreme Court of the United States the foregoing erroneous and prejudicial conduct of the prosecuting attorney would be sufficient grounds to reverse the judgment here entered. However, we will proceed with other claims of error involving venue and the proximate cause of death of the decedent.

Before considering these two questions, there is one other matter that requires attention. After the court's decision of guilty on the first count of the indictment without a recommendation of mercy had been pronounced on November 29, 1963, and the overruling of defendant's motion for new trial entered on December 30, 1963, the court said, upon calling the defendant before the bench for sentence:

"The Court: Have you anything to say why sentence should not be pronounced?

"Defendant: I would like to say, I believe the evidence in this case and the decision of this court does not prove me guilty. As God is my witness, I am innocent of this charge, now and always.

"Mr. Schmuck: If the court please, before the trial ever started, I went to see the court. I offered Mr. Putnam and Mr. Dowd to submit the defendant for polygraph test or sodium pentothal test, if administered by an unbiased person, provided that it be introduced in evidence and that was refused. As far as I am concerned this man is innocent. He is being sentenced for something he did not do.

"The Court: You say he is being sentenced for something he did not do? I was informed that counsel approached the prosecutor and asked if he wouldn't accept a plea of second degree murder in this case.

"Mr. Evans: This is the first time I ever heard of it and I certainly did not do it.

"Mr. Schmuck: I did, and I don't mind telling you I did it, without the consent of my client. I am well aware that he would have to spend many years in prison and if I could save the family from the embarrassment they would have to undergo I did suggest it.

"Mr. Evans: I also discussed that question with this defendant and was advised by this defendant that he would not make such a plea.

"Mr. Domer: I never did.

"Mr. Schmuck: He never authorized me to.

"Judge Weber: This court had no knowledge of it until after the trial. The three of us never gave any consideration to it.

"Mr. Evans: I am surprised that that had come to the attention of this court. I'm glad it's in the record.

"Judge Rossetti: That hasn't anything to do with our decision. I knew nothing about it until weeks after the decision was rendered.

"The Court: That's what I meant to say. I knew nothing of this until after the trial and verdict. Anything further? It will be the sentence of the court, therefore, that the defend-

ant, Robert Domer, be put to death in the electric chair. If there is any question about it, the execution will take place on—

"Judge Weber: That is the duty of the warden and not the court.

"Mr. Evans: There will be an appeal and probably a stay.

"The Court: I don't think we do either. I have had them before and I have never fixed the date, but if there is any question about it, the court will fix the time as of April 20, 1964.

"Mr. Dowd: State of Ohio has nothing further.

"The Court: That's all."

The foregoing statements of the court, completely erroneous as to the duties of the warden, must be interpreted in the light of the date of the decision which was only 31 days before the day of sentence. Whether this could be said to be "until weeks after the decision" or not, is doubtful. The disturbing factor of the statement of the court is the fact that it was said in an attempt to counter defendant's claim of innocence and to strengthen the court's judgment of guilty. Any conversation on the subject of offers to plead, if there be such between counsel, until there is an agreement to submit the question to the court in open session, should never have been related to the court and since it was used by the court in a sense as refuting defendant's claim of innocence at the time of sentence and ruling on the motion for new trial, error prejudicial to the defendant is clearly shown on the record.

One of the basic elements of the crime of murder is venue. This element establishes the jurisdiction of the court. The action must be brought in the county in which the force which is directed at the decedent with intent to kill originated if it is not thereafter interrupted before its contact causes death, or in the county where such unlawful force causes the unlawful death of the decedent, if such be the fact. Section 2931.19, Revised Code (126 Ohio Laws 812, 813), Section 10, Article I, Constitution of Ohio. The act committed must not be indifferent to the actual accomplishment of the unlawful purpose. The act performed purposely to kill another must proceed to a point beyond mere preparation, where it can be said that the act committed tends directly toward accomplishing such specific criminal purpose. There must be the performance of an act in furtherance of or carrying out at least, in part, one of the

necessary physical elements by which the murder is to be accomplished and of such a character that, unless interrupted by an unknown intermediate and independent force, the crime will be consummated.

Driving around, intending to kill a passenger in the automobile driven by the defendant, looking for a place to commit the act or going to a predetermined place to commit the proposed unlawful act, at most, is preparation which could not be punished in the trial of one charged with murder in the first degree committed after arrival at the place ultimately or previously determined. In *People* v. *Rizzo*, 246 N. Y. 334, 158 N. E. 888, 55 A. L. R. 711, the defendants were driving around, looking for the payroll employee of the United Lathing Company, intending to rob him. The opinion of the court states that Charles Rizzo, the defendant, and the appellant, (with others) planned to rob one Charles Rao of a payroll. The defendants, two of whom were armed, started out in an automobile looking for the payroll clerk. They were arrested before they found him, and the court held they were not guilty of an attempt to commit robbery.

In the case of *State* v. *Quick*, 199 S. C. 256, 19 S. E. 2d 101, the defendant was arrested for manufacturing intoxicating liquor. The only question presented on appeal was whether the trial court was in error in not directing a verdict at the end of the state's case. The court said there was overwhelming evidence of the defendant's intention to manufacture liquor but added, on page 258, that "the law does not concern itself with mere guilty intention, unconnected with any overt act. *State* v. *Kelly*, 114 S. C. 336, 103 S. E. 511, 14 American Jurisprudence, Section 25, page 786."

In the case of *Yoes* v. *State*, 9 Ark. 42, the facts are not clearly shown by the report, but in the opinion, on page 44, the court, in dealing with this question, said:

"* * * The mere fact of going to a place with the intention of doing an unlawful act, will not of itself subject the party to the punishment denounced against such act, unless he also carries his intention into effect."

The trial court charged the jury that if the jury believe from the evidence that the defendant went to the meeting-house yard and called Hughs out for the purpose of having difficulty with

him, they should find him guilty. This the court held was reversible error, no overt act having been commenced or committed to carry the unlawful purpose into effect.

Also, in the case of *State* v. *Rider*, 90 Mo. 54, 1 S. W. 825, the court said, on page 60:

"The mere intent to commit a crime is not a crime. An attempt to perpetrate it is necessary to constitute guilt in law. One may arm himself with the purpose of seeking and killing an adversary, and may seek and find him, yet, if guilty of no overt act, commits no crime. * * *"

See, also, *Proctor* v. *State*, 15 Okla. Cr. 338, 176 P. 771, and *People* v. *Buffum*, 40 Cal. 2d 709, 256 P. 2d 317, where on page 718, in considering the necessity of an act which is not indifferent to the crime intended, in addition to a purpose to commit it, the court states:

"* * * Preparation alone is not enough, there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature. (*People* v. *Miller, supra*, 2 Cal. 2d [527] at pp. 530-532.)"

See, also, Baldwin's Ohio Criminal Law (5th Ed.), 34, Chapter 25, Criminal Act.

From the rule, as thus stated, driving the deceased even to a predetermined place for the purpose of causing his death by incineration, as above stated, would constitute mere preparation, and until some act which goes further than preparation, and which act or acts, unless interrupted, would accomplish the criminal purpose, no criminal act would have been committed. Here the state attempts to prove the defendant's automobile was on the Stark County side of "County Line Road" because the deceased's cap and a pack of matches, said to be the defendant's, were found on the Stark County side of the road sometime after the defendant's burning automobile was found at the bottom of a slope to the west of County Line Road in Wayne County. At the place in question, the center line of County Line Road is the boundary line between Stark County to the east and Wayne County to the west. The defendant testified that he met the deceased (Riddle) in Akron on the night of April 18th. He returned to Akron on the 19th when he

again met Riddle and, at Riddle's request, after eating in Wooster, Ohio, he took him to Murphy's Motel, near Cleveland. Riddle was sick and vomiting, according to the defendant, and wanted aspirin which the defendant bought and gave to him. On April 20th, Sunday, after going to Youngstown and Salem, where they had something to eat at a place known as Timberlane's, they ended up at a motel in Canton. Both the state and the defendant introduced evidence to the effect that Riddle had suffered, and was then suffering, from a very severe heart disease. Such fact was clearly shown by the autopsy. A doctor, who treated him for a heart attack, testified that his heart condition was so bad that his life expectancy could only be foretold from day to day. The defendant testified that Riddle, after watching T. V., fell asleep or was asleep around 11 p. m. The defendant testified that he went out to eat. He said he was gone a couple of hours. He testified that, when he got back, he found Riddle dead. He had vomited, and on the bureau was the remains of a bottle of whisky the defendant had gotten from his office on April 4 or 5. This was in the early hours of April 21st. The defendant testified that, after trying to determine what to do, he dragged the body of Riddle to his automobile and pulled it into the back seat. He said he decided to dispose of the body in a strip mine in Pennsylvania. He stopped at the Congress Inn near Youngstown the night of April 21st. The next day (April 22) was spent again in considering what to do. He said he finally decided to have an accident leaving Riddle's body "in the car for me." He drove back to Canton and went to County Line Road. Before arriving there, he put the body in the front seat on the passenger's side. He drove heading south and stopped north of the Pennsylvania Railroad tracks at the top of a steep hill on County Line Road. The place where the car was stopped, he said was on the west side of the road. (This would be in Wayne County.) There, he said, he waited for a train and, as one approached, he poured gasoline (which he said he always carried in a gasoline can because his gas gauge was defective) over the body of Riddle and throughout the inside of the automobile. Thereafter he lighted a match which resulted in an explosion. He testified that he was standing on the left on the driver's side of the automobile in the "v" of the left hand front door. He was burned by

the explosion but, after extinguishing the fire on the clothes he was wearing, he got the car started down the hill, where it was found in flames some fifty feet west of the road in Wayne County and some twenty feet or more from the railroad tracks. With the record in this state, it is clear from the rule of law above cited that venue of the alleged crime in Stark County is not established beyond reasonable doubt and for that reason the judgment must be reversed. This does not mean that it will be impossible to prosecute the case charged against this defendant, if venue cannot be established either in Wayne County or Stark County, by evidence which will satisfy the triers of the facts beyond a reasonable doubt. Under such circumstances, Section 2931.19, Revised Code (126 Ohio Laws 812, 813), provides, in part:

"If neither the county in which any mortal wound is given, or other violence or injury inflicted or any poison administered by means whereof death results, nor the county in which the death occurs as a result of such wound, violence, injury or poison, is known, then the offender may be tried in the county in which the body of the deceased is found; provided, that if the offender is indicted in the county in which the fatal injury is alleged to have been inflicted at any time before his trial in another county, the sheriff of such other county must, if the offender be in custody, deliver him upon demand, to the sheriff of the county in which the fatal injury is alleged to have been inflicted."

That statute should be relied upon, keeping in mind that if the defendant did, in fact, purposely kill Riddle with deliberate and premeditated malice, his own testimony places venue in Wayne County.

It was suggested during argument that that provision of the statute is unconstitutional. No case is cited to support such claim and our research has found no such authority. The statute is one which declares a rule of evidence for determining venue under the circumstance here related and is a necessary rule for the enforcement of law and order.

We come finally to the question of whether the defendant maliciously and with deliberate and premeditated malice killed Howard Franklin Riddle. This question is dependent on the question of whether Riddle was alive when he was covered

with gasoline by the defendant and set on fire in defendant's automobile at about 2:10 a. m. of April 23, 1963. The state relies on the testimony of two pathologists who testified that, by microscopic examination of sections of flesh taken from the fleshy part of the body of the deceased as a part of a post mortem examination, they determined that the sections were taken from live flesh, thereby determining that the body of Riddle was alive when the fire was started. It should be stated that the body had been reduced by incineration from an estimated one hundred seventy to one hundred ninety pounds to an estimated seventy pounds.

On the other hand, the pathologists who testified on behalf of the state and for the defendant agree that the post mortem examination of the deceased's blood showed no trace of carbon monoxide. It is the positive conclusion of the pathologists who were called by the defense that this is positive proof that the body that was burned in defendant's automobile was dead when the fire was started. The state's witnesses, for the most part, agreed with this conclusion but say that they have heard of two or three cases where death was caused by fire where no carbon monoxide was found in the blood of the victims. Here again it should be noted that one of the pathologists called by the state said that he observed no carbon monoxide in the blood of the deceased and that this is one of the principal tests for the determination of death by fire, but he forgot to mention this finding in his report.

Certainly when considering the state of the record on the question of whether Riddle was alive when the fire was started, as claimed by the state, with the many other facts developed in the record challenging such conclusion, it cannot be said that the state has shown that the defendant caused the death of Riddle, by incineration, beyond a reasonable doubt. For this and the other reasons stated above, the judgment is, therefore, reversed and the cause remanded for further proceedings according to law.

*Judgment reversed.*

Corrigan and Wasserman, JJ., concur.

(Decided January 27, 1965.)

On Application for reconsideration.

Skeel, C. J. The matter now before the court is the application of the state of Ohio for reconsideration of the judgment of reversal heretofore entered. In the opinion filed making such entry, the court held that the defendant was not afforded due process in that he was deprived of the right to consult with his lawyer, even after demand was made. The facts upon which this conclusion was reached are clearly demonstrated by the record, and further consideration of that subject is unnecessary. The state complains that this question was not assigned as error, not briefed by the parties; wherefore, this court was without legal authority to consider the question. A reading of Section 2505.21, Revised Code, demonstrates the error of this complaint. It provides: "* * * but the court may consider and decide errors which are not assigned or specified." See Skeel's Ohio Appellate Law 142, Section 290. In addition to the facts thus clearly established, the record discloses many other circumstances which point to the fact that the defendant was not afforded a fair trial. We will call particular attention to one of several of such circumstances. The defendant on cross-examination was required to testify whether he had committed any "illegal acts" in getting money not then disclosed in the record on direct examination.

"Q. Would you tell the court about all of the illegal acts that you did in order to raise money from July 26th forward. Or did you only tell the court about those which had been proven positively in this courtroom.

"Mr. Evans: Object to the question.

"Judge Graham: Overruled.

"A. I told the court about those which we had discussed in the courtroom.

"Q. And only admitted those which you had heard proven, is that right? A. I would state in the sense that you phrase the question, yes.

"Q. Were there others? A. I do not know.

"Judge Weber: What do you mean, you do not know?

"A. I do not know.

"Q. What do you mean you don't know? A. I don't know whether any other acts I did may or may not have been criminal.

"Judge Weber: You are a lawyer.

"A. Yes, I never practiced.

"Q. Well, you practiced banking and you know you don't use other people's money for your own, don't you?

"Mr. Schmuck: Object.

"Judge Graham: Yes, sustained.

"Q. You knew that when you graduated from law school, didn't you? A. Yes.

"Q. You think you have told the court about all of the illegal acts that you committed from July, 1962, forward?

"Mr. Schmuck: Object.

"Judge Graham: Overruled.

"Judge Weber: In all fairness we don't have to call them criminal; shady, if you want, or if you knew it wasn't above board. We don't want to call it criminal. Are there any other acts?

"A. I want to be fair to the court, not to myself. There are so many things I did, people I saw.

"Judge Weber: You mean that was dishonest.

"A. Not necessarily dishonest, Your Honor. It's difficult for me to just categorically answer Mr. Putman's question.

"Q. Were there other times when you signed a name other than you [sic] own to a document? A. There may have been. I do not specifically recall any one.

"Q. Do you recall that there were very many of them? A. No sir, not yet.

"Judge Weber: What do you mean by not yet? You mean there were a lot?

"A. There may have been, Your Honor. I don't think so, but I can't say specifically.

"Judge Weber: There were at least some.

"A. There may have been.

"Judge Weber: Which is it, that's all we want to know.

"A. In order to proceed, yes."

There can be no doubt that the defendant's constitutional right not to be a witness against himself was here flagrantly violated.

The claim that this court did not pass on the applicability of Section 2931.32, Revised Code, is completely answered by the fact that the Supreme Court of Ohio has held such section unconstitutional as in violation of Section 10, Article I of the Constitution of Ohio. *State* v. *Chalikes*, 122 Ohio St. 35. The provision of the Constitution dealing with this question is:

"In any trial, in any court, the party accused shall be allowed * * * a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; * * *."

The historical background of this provision requires the conclusion that venue of a crime must be established in the county in which some direct act was committed in pursuance of the crime, and, therefore, a charge must be brought in a county coming within the scope of this rule.

It is also elementary, of course, that either direct or circumstantial evidence, or both, on each and every essential element of the crime is sufficient to warrant a finding of guilty, if such evidence satisfies the triers of the facts of the guilt of the accused beyond a reasonable doubt. However, where circumstantial evidence alone is, on any one or more of the essential elements of the crime, sufficient to justify a finding of guilty, the circumstance or circumstances must be entirely consistent with the defendant's guilt and wholly inconsistent with any theory of the defendant's innocence and so convincing as to exclude all reasonable doubt of defendant's guilt.

In connection with the element of venue, the record here is to the effect that when the defendant stopped his automobile on County Line Road before the fire, one front wheel was off the road and one rear wheel partly on and partly off the road on the Wayne County side. The road, according to the record, is twenty-two feet wide in the paved portion from berm to berm. It is a matter of common knowledge that the body of a 1958 Buick automobile at the front door is approximately six feet wide. The defendant testified that he opened the left front door and while standing in the "v" formed by the door and the car body lighted a match which caused an explosion of the gasoline he had previously sprinkled in the automobile and on the body of the alleged victim and that he then dropped the match folder. The defendant further testified that he did not know

in which county he was when he started the fire. The county line between Stark and Wayne Counties is in the center of this road. That would be eleven feet from the west edge of the road where the berm starts. The match folder was found on the Stark County side of the road, two feet from the center line. Is this one bit of circumstantial evidence relating to the position of the match folder when found in Stark County wholly inconsistent with any conclusion that the fire was started in Wayne County, as testified by the defendant, and the possibility that the force of the gasoline explosion when the fire was started blew the match folder when released from defendant's hand seven feet or more to the Stark County side of the road?

Then there was a cap, allegedly the property of the alleged victim, found on the Stark County side of the road, said to have been found five feet east of the center line. It is important to remember that these are the only established circumstances in the evidence which tend to prove the venue of this alleged crime in Stark County. There is not another fragment of evidence or testimony tending to establish that element of the crime charged. According to the defendant's testimony, the last time he saw this cap it was on the front seat to the left of the body of the alleged victim before the explosion. Is the circumstance of the finding of this cap on the Stark County side likewise consistent with the explosion occurring in Wayne County and the force of the explosion propelling this item of evidence to the Stark County side of the road? It is our considered opinion, upon reconsideration of this reversal of the judgment, that these two circumstances relied upon by the state to establish venue in Stark County are not inconsistent with the proposition that defendant started this fire in Wayne County and are not so convincing as to exclude all reasonable doubt as to his having started the fire in Stark County. We must bear in mind that if the circumstances create inferences that are conflicting or equally consistent with either innocence or guilt, then such evidence must be resolved in favor of defendant's innocence of having committed the crime charged in Stark County.

It is not the duty of a reviewing court to determine, and this court by its ruling did not indicate, the county in which a retrial of this case should be conducted. It was commenced in Stark County where any retrial must be had. The Grand Jury is the

only authority by which a charge upon an indictment in a felony case in which punishment by death is provided can be presented for trial. Section 10, Article I, Constitution of Ohio; Section 2939.08 and Section 2941.021 (128 Ohio Laws 53), Revised Code. The questions set out in the state's request for reconsideration on this subject show a complete misunderstanding, or perhaps a purposeful disregard, of the conclusions reached by this court and are not worthy of reply. The case is still pending in Stark County subject to retrial on the issues presented by the allegations of the indictment and the defendant's plea of not guilty. Whether the state should proceed with a retrial is for the prosecuting attorney to decide in the light of the law here found applicable to the case.

The question of whether this court is bound by the trial court's holding on the issues of fact as to the cause of death of the decedent, because there is some evidence introduced in support of this element of the state's case, is presented by the state's application for reconsideration. It is argued that since there is conflicting evidence on this issue, and because the trial judges are the sole judges of the credibility of the witness, their conclusions as to the truth of the facts contended for by the state are therefore final; and that this court treated "the entire question of weight of the evidence upon both issues of venue and cause of death as if it were in a hearing de novo rather than an error proceeding upon questions of law respecting weight of the evidence." We would not dignify this statement with reply but for the fact that the case cited by the state, *State v. Sheppard,* 165 Ohio St. 293, 135 N. E. 2d 340, supports completely the judgment here entered of reversal for the reason that as to either or both issues our conclusion is that there is insufficient substantial evidence to support the judgment. The subject of venue has already been considered. On the subject of the cause of death, the experts on both sides agree that without exception carbon monoxide is found in the blood of one meeting death by incineration. All the experts agree that no carbon monoxide was found in the blood of the deceased whose body had been two-thirds consumed by fire. One of the state's experts testified that there were on file three cases out of the great number he knew about where carbon monoxide was not found in the blood of a person who met death by incineration.

This witness was not involved in any of these cases or claimed any personal experience in the recorded results. There is not a syllable of evidence that would support a comparison of the facts of the instant case with the three isolated cases (called unusual by the expert witnesses) referred to by this witness. Considering further the fact that this witness either forgot or neglected to include in his report the dominant fact (in determining the cause of death) that no carbon monoxide was found in the blood of the deceased, together with the witness' apparent confusion on the period of time between death and the autopsy and other factors apparent on the face of the record, it was and is our conclusion that the decision and judgment is not supported by sufficient substantial evidence, when considering the entire record to warrant a finding of guilty beyond a reasonable doubt.

The record as certified to this court was not complete in that the proceeding in the Municipal Court instituted by the state before indictment was not contained in the transcript. This record was important to determine upon what authority the state continued to hold the defendant in jail after his arrest. Sections 2935.08 (129 Ohio Laws 582, 748), 2935.13 (128 Ohio Laws 97, 99), and 2937.02 (128 Ohio Laws 97, 103), Revised Code, require immediate action upon arrest by a police officer without a warrant by forthwith filing an affidavit charging the crime for which the arrest was made, securing a warrant and serving it on the accused and forthwith taking the accused before a magistrate who must then comply with Section 2937.02 (128 Ohio Laws 97, 103). The defendant was arrested on April 28th. The indictment was not returned until May 3rd, five days after arrest, and his arraignment followed after that date. An official according to the sections cited has no right to hold a person in jail without charge for that length of time. The claim that the prosecuting attorney needed time to determine whether a crime had been committed in Stark County is without merit. Until such fact had been determined, an arrest should not have been made. If it be claimed that other crimes could have been charged, the answer is that they were not, according to any record before us, and, had such action been taken, the defendant would have been entitled to bail. This court had the duty to check the public records dealing with this

case to see upon what authority the defendant was detained while the prosecutor conducted an inquisition before any charge was filed, which he now claims was for the defendant's benefit. No such benefit appears in the record. The only fact disclosed by examining the filing of the case in the Municipal Court was procedural in character about which this court was entitled to a full disclosure. In any event, it was a matter of public knowledge that the defendant was being confined in jail without a charge being placed against him.

It was the obligation of this court to pass on all the errors shown on the face of the complete record. The fact that such matters were overlooked and not cited as error by counsel and therefore not briefed is of no consequence. The purpose of a review of a case after it has been concluded by a trial court is to see that justice was done and not just to consider assigned errors presented by counsel. This is the duty imposed by law on a reviewing court. Section 2505.21, Revised Code.

The review of this case was made difficult by many unsupported statements in the brief of the state. To mention but two, on page 3 it is said, "The defendant's dogged search for a person his approximate size took three weeks, and is established by dozens of witnesses." No indication of where such statement is supported in the record is set out, and we find no evidence in the record to support it, although the implication intended is clearly apparent. Also, on page 40 of the state's brief, in dealing with the question of how the trial court was informed of an alleged offer on the part of the defendant to plead guilty to second degree murder, it is said, "The truth is that the prosecutor's office gave no such information to any branch of the court nor does the record support defendant's contention that it did." This court has set out in full in its opinion what is in the bill of exceptions on this question. There can be no doubt that such information was conveyed to the court. The judge's statement is clear and not subject to question. Defendant's counsel stated that they did not make known to the court a conversation which one of them had with the prosecuting attorney (he testified that he acted without the authority of his client).

The only person who was a party to this conversation (the prosecuting attorney) stood silent before the court when, if the

claim was not true, it was his duty to speak. The brief is not the place to present statements of fact which should have been made in the presence of the trial court when the matter was being considered.

The application for reconsideration is overruled.

*Application overruled.*

CORRIGAN and WASSERMAN, JJ., concur.

SKEEL, C. J., CORRIGAN and WASSERMAN, JJ., of the Eighth Appellate District, sitting by designation in the Fifth Appellate District.